# IN THE COURT OF APPEALS OF IOWA

No. 19-0988
Filed June 3, 2020

**MONUE FORKPAYEA GEIMAH,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Poweshiek County, Crystal S. Cronk,

Judge.

Monue Forkpayea Geimah appeals the denial of his application for

postconviction relief. **AFFIRMED.**

C. Aron Vaughn of Kaplan & Frese, LLP, Marshalltown, for appellant.

Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant

Attorney General, for appellee State.

Considered by Bower, C.J., and Doyle and Schumacher, JJ.

**BOWER, Chief Judge.**

Monue Forkpayea Geimah appeals the denial of his application for postconviction relief (PCR). He maintains plea counsel was ineffective in failing to advise him of the immigration consequences of pleading guilty to theft in 2017. On our de novo review, we conclude plea counsel did not inform Geimah "of all the adverse immigration consequences that competent counsel would uncover,"[1] but Geimah failed to prove he would not have pleaded guilty had he been adequately advised. We therefore affirm.

**I. Background Facts and Proceedings.**

On February 29, 2016, Geimah was charged with one count of theft in the third degree for "depositing checks with insufficient funds and receiving $841.00." On December 8, 2016, Geimah filed a written guilty plea to one count of theft in the fourth degree. This written guilty plea contained the following warning:

> Immigration Consequences. If you are not a citizen of the United States, a conviction may have immigration consequences. Immigration law is a specialized field of law. [Plea counsel] is not an immigration lawyer and you should seek the consultation of an immigration specialist if you want advice regarding the immigration consequences of your plea.

Geimah waived his right to be present at sentencing. On January 5, 2017, the district court entered judgment and Geimah was sentenced to one year in the Poweshiek County Jail, which was suspended. He was placed on probation for one year and ordered to pay a fine, surcharges, and costs.

---

[1] *Morales Diaz v. State*, 896 N.W.2d 723, 732 (Iowa 2017) (applying standard of practice enunciated in *Padilla v. Kentucky*, 559 U.S. 356 (2010)).

On January 28, 2019, Geimah filed a PCR application, asserting his plea counsel provided ineffective assistance by not adequately explaining the immigration consequences of his guilty plea.

Trial was held on May 15. Geimah, his wife, Melissa, and plea counsel testified at the trial. Geimah testified that he was born in, and is a citizen of, Liberia, West Africa. He legally immigrated to the United States in 2010. Geimah testified his father and his four half-siblings live in the United States, he is married to a United States citizen with whom he has two children. He stated he knows no one in Liberia. Geimah also testified that in March 2018 he turned himself in to authorities in Minnesota for an outstanding warrant for a driving while intoxicated charge. He testified he had completed the requirements of that case, and the charge was dropped. However, as he was being released, he was seized by Immigration and Customs Enforcement (ICE) and was placed in detention.

Geimah testified he contacted his plea counsel asking that she seek modification to the Poweshiek County judgment entry, and counsel filed a motion to set aside and re-sentence on April 17, 2018. The district court set aside the sentence, vacated any prison time, and sentenced Geimah to pay a fine, statutory surcharges, court costs, and victim restitution. Geimah believed he would be released from immigration detention if this amendment were made to the judgment entry. However, he remained in immigration detention and was subsequently ordered removed and ineligible to return.[2]

---

[2] On June 28, 2018, a federal immigration court ordered Geimah be removed from the United States to Liberia. The immigration court based this removal on two separate sections of the Immigration and Nationality Act ("INA"). First, the immigration court found that Geimah was removable because he violated INA

Geimah testified his plea counsel never asked about his immigration status, never asked about his criminal history, and never discussed the potential immigration consequences of pleading guilty. Geimah testified that had he known he would be deported and would not be eligible to return to the United States, he would never have pleaded guilty because he would be separated from his children.

Melissa testified all of Geimah's family with whom he has any relationship are in the United States, she and Geimah have two children together, including one who has a heart condition, and Geimah has always been involved with the children's care. She was asked whether Geimah would have pleaded guilty in the theft case had he known about the immigration consequences that were going to result from it and she replied, "I do not believe so. . . . Because we—we want—we want to remain as a family here in the United States."

Plea counsel testified she knew Geimah was not a United States citizen:

I recall him—You know, my general thing is the second that I found out that he is not—first not—You could tell that English was not his first language, you know. We had a brief conversation. That's when I found out he was from Liberia, and he had—he did ask about

---

section 237(a)(2)(E)(ii) [8 U.S.C. § 1227(a)(2)(E)(ii)] because he was "enjoined under a protection order and has been determined to have engaged in conduct in violation of that order that involves protection against credible threats of violence, repeated harassment, or bodily injury to that person or persons for whom the protection order was issued[.]" Specifically, the immigration court found that Geimah's wife, Melissa, asked for and received an order of protection against Geimah based on "physical abuse, sexual abuse, and threats, as well as fear for physical safety[,]" and that Geimah violated this order of protection when he went to Melissa's home. This violation subjected Geimah to removal from the United States.

The immigration court also found Geimah was independently removable under INA section 237(a)(2)(A)(ii) [8 U.S.C. § 1227(a)(2)(A)(ii)] because he was convicted of two crimes of moral turpitude: the January 5, 2017 Poweshiek County conviction for theft in the fourth degree (challenged here) and a February 14, 2017 Black Hawk County conviction for theft in the fifth degree (entered after a bench trial).

immigration. I had indicated I don't know a lot about immigration. Generally, anything can get you deported and that immigration takes into consideration different factors, and clearly if he was in this country illegally that he would most certainly be deported. I—I recall him saying that he had a green card at that conversation, and I had again told him I am not an immigration attorney. He should speak with an immigration attorney for more specifics. He indicated he had a case going on somewhere else and that he would talk to that attorney.

Q. Do you remember where that other pending case was? A. No, he didn't tell me. I don't believe he told me at that point where the other county case was or anything like that.

Q And— A. He was with his wife that day as well.

Q. —And a similar question. Did he ever mention who the attorney in that other case was? A. No.

Q. And as part of your representation of Mr. Geimah, did you ever ask him what his criminal history in the United States was? A. He told me he had that case. I think that he ended up picking up another charge while my case was pending because he was jailed, and his wife attended that pretrial conference. I think the only other specific that I knew about was the offense that he was jailed for. I believe that one was out of Black Hawk County during the pendency of my representation with him, and I almost thought that was like a domestic abuse charge or something like that. But other than me getting his presence excused because he was currently in jail, that was the extent of my communication regarding that charge, and that information came to me through his wife.

Q. And you were aware that Mr. Geimah was from Liberia? I don't recall if you said whether you knew what his immigration in the United States was, so did you ever find out what his immigration status in the United States was during your representation? A. I believe he had told me that he had a green card and that he was currently married to his wife, who is a U.S. citizen. That—That's pretty much what I remember, and that was from that very first conversation that, you know, I tried to make clear I'm not an immigration attorney. I don't know exactly what consequences you could ultimately be facing, you know. Those could be up—Those could be deportation. I mean, literally, that's my spiel.

. . . .

Q. Did you personally ever consult with any immigration attorneys as part of your representation of Mr. Geimah prior to the guilty plea and sentencing? A. At the time that his case was going on, that was not the current standard so, you know, I did not.

. . . .

Q. And prior to Mr. Geimah being issued his original sentence in the case, did you and he ever discuss the possibility that the Poweshiek County case would result in him never being able to

legally reenter the United States if he did get deported? A. No. It was literally deportation is the only word I said and speak to an immigration attorney.

On cross examination, trial counsel testified further:

Q. [Counsel], when you spoke to Mr. Geimah about potential adverse immigration consequences and informed him that he needed to speak to an immigration attorney, was it your understanding that he had an immigration attorney at that time? A. The way that he said he had another attorney and basically would ask them made me feel like he would get his questions answered, and since he didn't bring it up anymore, I thought he got his questions answered. He never specifically—To be a hundred percent fair and honest, he never specifically told me that that was an immigration attorney, but the context was he would answer or ask the other attorney, and then he never brought it up.

On redirect, Geimah's counsel asked:

Q. [Counsel], regarding the other attorney that Mr. Geimah mentioned to you about immigration advice, did you ever attempt to follow up with that other attorney to see if Mr. Geimah's questions had been answered? A. No. He didn't tell me what the attorney was even for. I didn't—At that time I didn't know he had criminal charges pending someplace else. I still am not certain that he did, but I—he didn't tell me who it was or what it was for, and I really didn't, necessarily, think that it was, you know, my business.
Q. Would it be accurate to also say, then, that you didn't ask him for any more details about who the attorney was or what the other attorney's purpose was? A. That would be fair.

The district court entered its ruling on May 16, 2019, finding plea counsel breached no duty because she

discussed the case with Applicant and negotiated a plea agreement whereby Applicant was not placed into custody, which was his desired result. [Counsel] also put him on notice of the possible consequences, including deportation, and advised him to seek advice from immigration counsel. [Counsel] confirmed this notification in the written guilty plea sent to Applicant.

The court found plea counsel's "testimony regarding her advisement to [Geimah] regarding possible deportation is credible."

The court found Geimah's testimony that he had no awareness of the possible immigration consequences was not credible because "[t]his case was not his first involvement with the U.S. court system; he had prior charges in Minnesota, as well as in Black Hawk County, Iowa," and he was "represented by counsel in all of the criminal cases."

Geimah appeals.

## II. Scope and Standard of Review.

We review PCR proceedings for correction of legal error unless they raise constitutional issues, in which case our review is de novo. *Perez v. State*, 816 N.W.2d 354, 356 (Iowa 2012). A claim of ineffective assistance of counsel raises constitutional issue and thus our review is de novo. *Morales Diaz*, 896 N.W.2d at 727.

## III. Discussion.

"Ineffective-assistance-of-counsel-claims require a showing by a preponderance of the evidence both that counsel failed an essential duty and that the failure resulted in prejudice." *Id.* (citation omitted). An attorney's performance is constitutionally deficient when the attorney fails to advise the defendant on the immigration consequences of pleading guilty. *Padilla*, 559 U.S. at 368–69; *Morales Diaz*, 896 N.W.2d at 729. The applicant must show counsel's performance "fell below an objective standard of reasonableness." *Morales Diaz*, 896 N.W.2d at 728 (citation omitted). In defining this standard, "[w]e look to the practice and expectations of the legal community." *Id.* (citation omitted).

If an applicant satisfies the first prong, the next step is proving prejudice. In this context, an applicant proves prejudice by showing he or she would not have

pleaded guilty and instead would have insisted on going to trial. *Id.* Importantly, "[t]his does not mean the defendant must show he or she would have prevailed at trial." *Id.* at 729. "Rather, the defendant must only show the 'decision to reject the plea bargain would have been rational under the circumstances.'" *Id.* (quoting *Padilla*, 559 U.S. at 372).

*A. Breach of duty.* We note the PCR court did not cite *Padilla* or *Morales Diaz*, but did conclude plea counsel "put [Geimah] on notice of the possible consequences, including deportation." On our de novo review of the record, we cannot come to the same conclusion. Moreover, the State concedes that Geimah's defense attorney failed to comply with the standards expected of attorneys:

> [C]ounsel after *Padilla* is held to the same standard counsel was before *Padilla*: to provide objectively reasonable assistance as measured by prevailing professional norms. *See Commonwealth v. Lavrinenko*, 473 Mass. 42, 38 N.E.3d 278, 290 (2015) ("[T]he failure of a criminal defense attorney to make a reasonable inquiry of the client regarding his or her citizenship and immigration status is sufficient to satisfy the deficient performance prong of the ineffective assistance analysis."); *State v. Favela*, 343 P.3d 178, 182 (N.M. 2015) ("A defense attorney's failure to advise a client of the 'specific immigration consequences of pleading guilty, including whether deportation would be virtually certain' renders that attorney's performance deficient, which satisfies the first prong of the *Strickland* test." (quoting *State v. Paredez*, 136 N.M. 533, 101 P.3d 799, 805 (2004))); *see also* Lindsay C. Nash, *Considering the Scope of Advisal Duties Under* Padilla, 33 Cardozo L. Rev. 549, 576 (2011) ("[D]efense attorneys must investigate and research the law using available resources and then advise noncitizen defendants about immigration consequences at the level of specificity that research permits."). Counsel's duty as interpreted in *Padilla* does not depend on an assessment of the clarity of the consequences or on categorizing them as strictly related to deportation. Instead, consistent with the approach we have always taken, counsel's duty depends on society's expectations of its attorneys.
>
> In *Padilla*, the U.S. Supreme Court looked to "norms of practice as reflected in American Bar Association standards and the

like" to measure counsel's performance. *Padilla*, 559 U.S. at 366 (quoting *Strickland*, 466 U.S. at 688). Consulting the current version of the American Bar Association guidelines now, we find they recommend the following:

> (a) Defense counsel should determine a client's citizenship and immigration status, assuring the client that such information is important for effective legal representation and that it should be protected by the attorney–client privilege. Counsel should avoid any actions that might alert the government to information that could adversely affect the client.
>
> (b) If defense counsel determines that a client may not be a United States citizen, counsel should investigate and identify particular immigration consequences that might follow possible criminal dispositions. Consultation or association with an immigration law expert or knowledgeable advocate is advisable in these circumstances. Public and appointed defenders should develop, or seek funding for, such immigration expertise within their offices.
>
> (c) *After determining the client's immigration status and potential adverse consequences from the criminal proceedings, including removal, exclusion, bars to relief from removal, immigration detention, denial of citizenship, and adverse consequences to the client's immediate family*, counsel should advise the client of all such potential consequences and determine with the client the best course of action for the client's interests and how to pursue it.
>
> (d) If a client is convicted of a removable offense, defense counsel should advise the client of the serious consequences if the client illegally returns to the United States.

ABA Standards for Criminal Justice: Prosecution Function and Def. Function 4-5.5 (4th ed. 2015). We recognize these recommendations are demanding, but we do not find them too onerous a burden to place on the professional advisers employed to represent their clients' best interests.

*Morales Diaz*, 896 N.W.2d at 730–31 (emphasis added). "Whether or not deportation consequences are certain or possible under a criminal charge, the specific statutory consequences need to be explained with reasonable clarity so a full and measured decision to plead guilty can be made." *Id.* at 732.

Here, defense counsel repeatedly stated she informed Geimah deportation was possible and advised him to speak with an immigration attorney. This does not comport to the standard expected and, thus, plea counsel breached a duty when she did not adequately inform Geimah regarding the immigration consequences of his guilty plea.

*B. Prejudice.* Yet, Geimah must also show counsel's breach of duty resulted in prejudice. Geimah testified that had his counsel informed him of the immigration consequences of his plea, he never would have entered it. "We must decide whether this would have been a rational choice." *Id.* at 732–33.

On appeal, Geimah maintains that had he "been aware of the immigration consequences of a conviction (deportation, cancellation of removal, inability to legally reenter the United States following deportation, inability to naturalize etc.)," rejecting the plea and going to trial "would have been entirely reasonable under the circumstances." We must consider the circumstances Geimah was in at the time he was deciding whether to take the plea. *See Lee v. United States*, 582 U.S. ___,137 S. Ct. 1958, 1967 (2017) ("Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences."). We acknowledge "[t]he decision whether to plead guilty also involves assessing the respective consequences of a conviction after trial and by plea. When those consequences are, from the defendant's perspective, similarly dire, even the smallest chance of success at trial may look attractive." *Id.* at 1966 (citation omitted).

On July 17, 2015, Geimah pleaded guilty in Black Hawk County to violating a no-contact order. Therefore, at the time Geimah was considering whether to plead guilty in Poweshiek County, he was already deportable.[3]

In early 2017, Geimah also had two pending charges of theft, which are considered "crimes of moral turpitude." Being convicted of one crime involving moral turpitude committed within five years after the date of admission and "for which a sentence of one year or longer *may* be imposed" renders a noncitizen deportable. 8 U.S.C. § 1227(a)(2)(A)(i) (emphasis added). Being convicted of two or more crimes involving moral turpitude "at any time after admission" renders a noncitizen deportable. *Id.* § 1227(a)(2)(A)(ii).

In Poweshiek County, Geimah was charged with theft in the third degree, for which a term of two years may be imposed. *See* Iowa Code §§ 714.2(3), 903.1(2) (2016). Geimah pleaded guilty to theft in the fourth degree—an offense for which a sentence of one year may be imposed. *See id.* §§ 714.2(4), 903.1(1). Thus, either theft in the third or fourth degree would have rendered Geimah deportable—but Geimah was already deportable due to the earlier conviction for violation of the protective order.

---

[3] *See* 8 U.S.C. § 1227(a)(2)(E)(ii) ("Any alien who at any time after admission is enjoined under a protection order issued by a court and whom the court determines has engaged in conduct that violates the portion of a protection order that involves protection against credible threats of violence, repeated harassment, or bodily injury to the person or persons for whom the protection order was issued is deportable. For purposes of this clause, the term 'protection order' means any injunction issued for the purpose of preventing violent or threatening acts of domestic violence, including temporary or final orders issued by civil or criminal courts (other than support or child custody orders or provisions) whether obtained by filing an independent action or as a pendente lite order in another proceeding.").

Still, Geimah's plea allowed him to avoid being convicted of an "aggravated felony" and avoid a term of imprisonment.[4]  "[A] noncitizen convicted of [an aggravated felony] is subject to *mandatory* deportation."  *Lee*, 137 S. Ct. at 1963 (emphasis added).  An alien convicted of an aggravated felony also faces expedited removal proceedings.  8 U.S.C. § 1228(a)(3)(A).  Geimah's guilty plea allowed him to avoid mandatory and expedited removal proceedings.

Deportation or removal is not the sole immigration consequence of import, however.  An alien may qualify for cancellation of removal.  For a lawful permanent resident to be eligible for cancellation of removal, he must (1) lawfully be admitted as a permanent resident for at least five years (which Geimah was), (2) have resided continuously in the U.S. for at least seven years after legally being admitted into the U.S., and (3) not be convicted of an aggravated felony.  8 U.S.C. § 1229b(a)(1)–(3).  The immigration court noted the Poweshiek County conviction did not result in a term of imprisonment, and thus rejected finding Geimah had been convicted of an aggravated felony.

Nonetheless, the immigration court determined Geimah was not eligible for cancellation of removal:

> [R]espondent [Geimah] is not eligible statutorily for cancellation of removal for permanent residents under INA section 240A(a) [8 U.S.C. § 1229b].  That is due to the court's ruling that the respondent's theft convictions constitute crimes involving moral turpitude, and they were both committed within seven years of the respondent's only admission into the United States in 2010.  Essentially, respondent was admitted on June 1, 2010[,] and he was convicted in January and February of 2017 for theft offenses

---

[4] "A theft offense . . . for which the term of imprisonment [is] at least one year" is an aggravated felony."  8 U.S.C. § 1101(a)(43)(G).  Theft in the third degree, punishable by a term of imprisonment of two years, qualifies as an aggravated felony.  *See* Iowa Code §§ 714.2(3), 903.1(2).

> committed prior to that date. As such, they were within seven years of his admission. As such, the respondent's continuous residence clock was cut off *after the commission of the second offense* [of moral turpitude].

(Emphasis added.) *See* 8 U.S.C. 1229b(d)(1) ("For purposes of this section [related to cancellation of removal], any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . (B) when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2) or 1227(a)(4) of this title, whichever is earliest."); *cf. Barton v. Barr*, ___ S. Ct. ___, 2020 WL 1941965, at *5 (2020) (interpreting this 'stop-time rule' and concluding "cancellation of removal is precluded if a noncitizen *committed* a § 1182(a)(2) offense (as in Barton's case) the *conviction* occurred after the seven years elapsed"). The "stop-time rule" was triggered upon Geimah's commission of two crimes of moral turpitude within the seven-year period after admission.

The State notes that by pleading guilty in Poweshiek County Geimah avoided going to prison. Geimah did testify he "was happy" because he would not go to jail and would be placed on unsupervised probation. On our de novo review, and considering all the circumstances, we conclude a decision to reject the plea bargain at the time would not have been rational. Consequently, Geimah has failed to establish the requisite prejudice, and his ineffective-assistance-of-counsel claim fails.

**AFFIRMED.**